Harold D. THOMPSON and Idella S. Thompson, husband and wife, Appellees,

v.

ANDOVER OIL COMPANY, a Wyoming corporation; and Honeymon Drilling Co., Ltd., an Oklahoma corporation, Appellants.

Nos. 59916, 60890.

Court of Appeals of Oklahoma, Division No. 2.

Oct. 30, 1984.

Released for Publication by Order of Court of Appeals Nov. 29, 1984.

John M. Nelson, Park, Nelson, Caywood & Park, Chickasha, for appellees.

Mark Henricksen, Erbar, Henricksen & Erbar, El Reno, for appellants.

MEANS, Presiding Judge.

The Thompsons, as surface owners, brought this action against Andover Oil Company, an oil and gas lessee, for the recovery of surface damages resulting from oil and gas operations. Andover and its subsidiary Honeymon Drilling, appeal from a jury verdict and award of attorney's fees in this action based on nuisance. Having reviewed the record and applicable law, we affirm in part and modify in part.

Andover held a number of oil and gas leases for the land on which the Thompsons owned the surface. In August 1981, in order to preserve its leases, Andover approached Thompson about drilling on his farm. At that time Andover stressed that it needed to begin work immediately, and it began preparations for drilling the day after its agent spoke to Thompson. An area of approximately six acres was utilized in preparation for drilling. This preparation included construction of a road, pad, and pit site.

On the day prior to the actual spudding of the well, Andover abandoned this location in favor of a site on the opposite side of the farm. At the time it began preparations of the initial site Andover did not have access to certain geological data which later became available. When this information was released it moved operations to a site where the possibility of successful drilling was greater. As a reasonable prudent operator Andover was re-

quired to drill in an area where recovery of oil and gas was more likely to occur. Andover cited the immediate availability of a drilling rig as the reason for its haste in preparing the first site and then abandoning it hurriedly and moving to another location. The location of the initial site was not used for any purpose toward Andover's oil and gas operations, and was substantially restored to its former condition the next summer.

The preparation of the second well site was similar to the first. Andover utilized an area of a little more than eight acres in the construction of a road, a reserve pit, and a pad. However, this second site was on sloping terrain and construction of the pad necessitated moving a large quantity of earth in order to create a level area. Andover restored the area surrounding the site and at the time of trial was using a total of 2.2 acres for the life of the well.

Prior to its restoration efforts, Andover consulted with the Soil Conservation Service and followed its recommendations. Andover also had discussions with Thompson concerning the restoration efforts at both sites. At the abandoned site, Andover removed most of the gravel used for the pad and road but was unable to remove all of the substance. In grading the abandoned location, the grade was changed slightly so that water occasionally stands in this particular area, thus making it unsuitable for certain crops, such as alfalfa.

After restoration attempts were completed the Thompsons brought suit against Andover and Honeymon for permanent and temporary injury to their land and the maintenance of a nuisance as a result of drilling operations. The Thompsons alleged that Andover had abused their rights by using more of their property than was reasonably necessary. They further alleged that Andover failed to restore the property to its original condition. The Thompsons asked for actual damages and punitive damages, contending that Andover's actions were willful and done in wanton disregard of their property rights.

At trial the jury heard conflicting evidence concerning the extent of the damage to the Thompsons' farm. The Thompsons' evidence of damage included the gravel which remained on the land, erosion, burial of drilling muds, and irregular grading. Although Thompson could place no monetary value on his nuisance claims, he also asserted that damage had occurred due to annoyance and inconvenience of drilling operations. This included the fact that he was sometimes required to remove his cattle from certain fields.

After viewing the property, the jury awarded the Thompsons $50,000 in actual damages, but awarded no punitive damages. At the hearing on attorney's fees, the Thompsons were awarded $15,750. Andover has appealed both the jury verdict and the attorney's fee award.

As its propositions of error, Andover argues that (1) the award is not supported by competent evidence, (2) the court erred in refusing to admit certain oil and gas leases into evidence, (3) the court erred in instructing the jury on punitive damages, and (4) the award of attorney's fees is not supported by the evidence.

I

■ In cases involving alleged damages to the surface, the legal principle which this court must use as a starting point for the determination of the appropriate remedy is that an oil and gas lease creates and vests certain rights and responsibilities. In Oklahoma, the surface estate is servient to the dominant mineral estate for the purposes of the oil and gas lease. *Wellsville Oil Co. v. Carver*, 206 Okl. 181, 183, 242 P.2d 151, 154 (1952). An ordinary or conventional oil and gas lease carries with it the incidental or implied right to enter, possess, and use the surface to the extent and in such a manner as is reasonably necessary to enable the lessee to perform all the legitimate obligations imposed upon him by the lease, and to effectuate the purpose of the lease. As stated in *Wilcox Oil Co. v. Lawson*, 341 P.2d 591, 594 (Okla.1959) (emphasis added):

The holder of a valid oil and gas lease has the right and privilege to go on the land and do all those things necessary and incidental to the drilling of wells, including the right to the use of the surface, and in the absence of a provision that lessee would be liable for growing crops, *the only basis for recovery of damages is proof of wanton or negligent destruction, or that damages were to portion of land not reasonably necessary for oil and gas development.*

Underlying the question of what constitutes reasonable use of the surface in the development of oil and gas is the concept that the right of an oil and gas lessee to reasonably necessary surface use must be exercised with due regard to the right of the owner of the surface. Consequently, a lessee has the duty to protect the surface as to those areas where an implied incidental necessity does not exist. *Pulaski Oil Co. v. Conner*, 62 Okl. 211, 214, 162 P. 464, 466 (1916). Thus, it is clear that the *only* basis for recovery of damages by the Thompsons is proof of wanton or negligent destruction of the surface, or that damages were to a portion of the land not reasonably necessary in the drilling operations. *Cities Service Oil Co. v. Dacus*, 325 P.2d 1035, 1036 (Okla.1958). Where a surface owner purchases his property subject to a valid oil and gas lease his right to any recovery, in the absence of negligence, must be predicated upon proof that the lessee used more land than it was entitled to use under the terms of the lease. *Lone Star Producing Co. v. Jury*, 445 P.2d 284, 286 (Okla.1968).

Of course, the surface owners cannot recover damages due to the mere presence of oil and gas operations on their land, but must prove either Andover's negligence, or that Andover used more of the surface than was reasonably necessary. The Thompsons neither alleged nor proved negligence, nor was the jury instructed on negligence theories, and the case below was tried on the contention that Andover used more of the surface than was reasonably necessary for operations. We note that the burden of proving unreasonableness, that Andover used more of the surface than was necessary, was on the Thompsons as plaintiffs. *Davon Drilling Co. v. Ginder*, 467 P.2d 470, 473 (Okla. 1970).

The extent to which the use of the surface is reasonably necessary for oil and gas operations is a question of fact for the jury. *Davon Oil Co. v. Steele*, 186 Okl. 380, 383, 98 P.2d 618, 621 (1940). Normally, the plaintiff is required to prove the unreasonable use before he can recover. However, at the trial below, Andover conceded that it was responsible for some extent of damage to the Thompson farm. Thus, the only issue to be determined by the jury was the amount of damages.

II

On appeal Andover asserts that the award of $50,000 is excessive and contrary to law. In examining the award, this court must look to the record to determine if there is any evidence reasonably tending to support the verdict. *First National Bank of Amarillo v. LaJoie*, 537 P.2d 1207, 1211 (Okla.1975).

In cases involving surface damages, the alleged damages will normally be either permanent damage, temporary damage, or damage caused from the maintenance of a nuisance. Although all three are related somewhat, the measure of damage is calculated differently for each.

Permanent injury to property occurs when it "may not be successfully repaired so that it will be substantially in as good a condition as it was before the injury." *Keck v. Bruster*, 368 P.2d 1003, 1005 (Okla.1962). The court in *Keck* established the standard for measuring damages as: "Where damages are of a permanent nature, the measure of damage is the difference between the actual value immediately before and immediately after the damage is sustained." It has been consistently held that the diminished value is the diminished value of the entire unit and not the difference in the value of the specific

land which is harmed. *Sunray DX Oil Co. v. Brown,* 477 P.2d 67, 69–70 (Okla.1970).

A temporary injury to property is one which can be cured or repaired by restoration. The *Keck* court defined it as: "Where property can be repaired and substantially restored to its former condition, the measure of damage is the reasonable cost of repairing the damage and restoring it to its former condition." *Keck v. Bruster,* 368 P.2d at 1004. However, the cost of restoration cannot exceed the depreciated value of the land itself. *Peevyhouse v. Garland Coal & Mining Co.,* 382 P.2d 109, 114 (Okla.1962), *cert. denied,* 375 U.S. 906, 84 S.Ct. 196, 11 L.Ed.2d 145 (1963).

The final theory of recovery found in cases of this type is based on the private nuisance concept. Title 50 O.S.1981 § 1, defines "nuisance" as "unlawfully doing an act, or omitting to perform a duty, which ... [a]nnoys, injures or endangers the comfort, repose, health, or safety of others; or ... [i]n any way renders other persons insecure in life, or in the use of property." Generally, liability does not depend upon the negligence of a defendant and may exist although there was no negligence. Negligence is not an essential element of a cause of action for nuisance and need not be proved. *Cities Service Oil Co. v. Merritt,* 332 P.2d 677, 684 (Okla.1958). Thus, in order to maintain a cause of action for nuisance, the plaintiff must prove an unlawful act or omission of duty which either injured or endangered his use of his property.

The personal inconvenience, annoyance, and discomfort to a property owner caused by the maintenance of a nuisance is a separate and distinct element of damage. The measure of damage is the *reasonable compensation* for the injury. *Phillips Petroleum Co. v. Ruble,* 191 Okl. 37, 38, 126 P.2d 526, 527 (1942). A cause of action based on nuisance may include both permanent and temporary injury to property as well as damages for annoyance. The appropriate measure of damage in a nuisance action was stated in *Tenneco Oil Co.*

*v. Allen,* 515 P.2d 1391, 1392 (Okla.1973), as:

Damages adjudged in an action predicated on a nuisance theory may include clean-up costs of oil and gas lessee's surface impediments not necessary for its operation, damages for use of land by lessee for more than a reasonably necessary period of time for its operations, for lessee's unnecessary use of land area in its operations, and for temporary and permanent injury to the land.

As the case was submitted to the jury on nuisance theories, this court must examine the record to see if the award "reasonably compensates" for the injury. The Thompsons presented evidence of permanent injury caused by Andover's burial of drilling muds on the land. Although Andover disputed both the harmful effects of this practice and the reasonableness of its action, there was other testimony before the jury to show that the land had been permanently damaged. The Thompsons' evidence of temporary injury included erosion, silting of their pond, and irregular grading. Although all can be corrected by restoration, there was considerable difference in the testimony presented by both sides as to the cost. Thompson could not put a value on his claims for annoyance and inconvenience, but noted that he had numerous difficulties caused by Andover's leaving gates open and other acts.

Thompson testified that the difference in the fair market value of his property before and after the injury was $50,000. Andover attacks this as being incompetent evidence, pointing out that Thompson's own expert witness testified that the difference in value was only $24,330. Thompson asserts that a property owner is competent to testify as to the value of his land, citing *H.D. Youngman Contractor v. Girdner,* 262 P.2d 693, 696 (Okla.1953), where the court held that the owner of the property is competent to testify as to the value of his land regardless of his expertise concerning property values. In *Cities Service Oil Co. v. Merritt,* 332 P.2d 677 (Okla.1958), the plaintiff's testimony was that she thought

her land had depreciated by $40,000 while her own expert testified that it had been harmed only to the extent of $28,000. The court upheld the jury's verdict of more than $30,000, finding that it was within the bounds of the evidence.

■ Here, we note also that the testimony concerning the costs of restoration was as high as $70,000. While the award for damages for restoration cannot exceed the depreciated value of the land, the $50,-000 award is clearly within the bounds of the evidence presented. The award is supported by competent evidence and is affirmed. *Cities Service Oil Co. v. Merritt,* 332 P.2d at 679.

### III

Andover asserts that the court erred in failing to admit into evidence the oil and gas leases covering the property in question. However, these leases were executed with the mineral owners after the Thompsons had purchased their land, and the Thompsons were not a party to any of the leases. Andover contends that the leases limit its liability to payment for destruction of growing crops.

■ Neither the terms of the leases, nor the law limits such liability. *Wilcox Oil Co. v. Lawson,* 341 P.2d 591, 594 (Okla. 1959), stated that if the lease contained a provision for damage to growing crops, the plaintiff could recover damages for his crop, *as well as* damage for unreasonable use of the surface. Such a provision in a lease thus allows the surface owner to recover for damage to growing crops even when the lessee's actions and use are reasonable. In the absence of such a provision, the surface owner can only recover if the use is unreasonable or negligent. As the Thompsons did not ask for damages to their growing crops, but merely contended unreasonable use of the surface, the leases were totally irrelevant.

### IV

■ Andover also contends that the court erred in giving instructions on puni-

tive damages. However, as the jury returned no punitive damage award the instruction is not reversible error. Errors in the admission of evidence or in the giving or refusing to give instructions will not be cause for reversal if the jury was not misled by them. *Missouri-Kansas-Texas R.R. v. Harper,* 468 P.2d 1014, 1017–18 (Okla. 1970).

### V

■ As its final proposition of error, Andover asserts that the court erred in awarding an attorney's fee of $15,750. This court agrees. In *State ex rel. Burk v. City of Oklahoma City,* 598 P.2d 659 (Okla.1979), the court set forth factors to be considered in determining the amount of attorney's fees. The *Burk* court determined that an attorney seeking compensation over that amount necessary to compensate him on an hourly basis must justify the excess by establishing several factors. Among these are the difficulty of the case, the expertise of counsel, the risks involved, and the results achieved.

Thompsons' counsel testified that he had completed forty hours of work in this case and that he normally charged $75 per hour for legal work outside of trial time and $150 per hour for time in court. He stated that the case was "not too much different from others." There were no unique factual issues nor research problems. According to his own testimony, he would be entitled to $4,200 based on his hourly fee schedule. However, the trial court awarded a "bonus" of $11,500. It is quite possible that the court awarded this "bonus" because counsel testified that he had an arrangement with his clients whereby any attorney's fee would be added to the jury verdict and the contingency fee would be one half of the combined total. Thus, based on the award of $15,700, counsel would receive a fee of $32,875 rather than $25,000.

■ We note that the presence of a contingency fee is a matter between the client and his attorney and is not binding on the court in awarding an appropriate

fee. *Burk* established that after arriving at a figure for the hourly rate, the court must consider if it is appropriate to award additional compensation. Among the factors to consider in determining this "incentive fee or bonus" are the benefits conferred on the prevailing party, the difficulty of the issues, and the attorney's expertise in dealing with them. *Burk*, 598 P.2d at 661.

Here, counsel for the Thompsons testified that he spent forty hours on the case and that he did not consider the case difficult. He made reference to the issue of punitive damages; however, as we have previously stated, he was unsuccessful in this endeavor. He indicated that there were no complicated legal issues and did not hold himself out to be an expert in this type of litigation. Furthermore, the award of $50,000 which the jury returned for his clients is less than twenty percent of the amount which the Thompsons prayed for. None of these factors justify an incentive bonus of nearly three times the amount of hourly compensation.

■ Based on the evidence presented at the hearing on attorney's fees, this court finds that a reasonable fee for the work done in this case is the hourly compensation of $4,200 plus an incentive bonus of $5,800 for a total of $10,000. The attorney's fee is thus modified to bear a reasonable relationship to the pertinent standards used in determining such fees.

REIF, J., concurs.

BACON, J., concurs in part and dissents in part.